<u>NOT FOR PUBLICATION</u>                                              (Doc. No. 35)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____

JOHN GABRIEL HORNEFF, JR.,                    :
                                              :
              Plaintiff,                      :
                                              :
       v.                                     :          Civil No. 13-975 (RBK/KMW)
                                              :
PSEG NUCLEAR, LLC, et al.,                    :          **OPINION**
                                              :
              Defendants.                     :
_____              :

**KUGLER**, United States District Judge:

       This matter comes before the Court on the motion of Defendants PSEG Nuclear LLC,

PSEG Power LLC and Public Services Enterprise Group Incorporated (collectively "Defendants"

or "PSEG") for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Doc. No.

35). The subject of this motion is Plaintiff John Gabriel Horneff, Jr.'s ("Plaintiff" or "Horneff")

Complaint, in which he alleges violations of the Employee Retirement Income Security Act, the

New Jersey Law Against Discrimination, and the New Jersey Common Law against Defendants.

For the reasons stated herein, Defendants' Motion for Summary Judgment be granted.

**I.      FACTUAL BACKGROUND[1]**

       This suit arises out of Plaintiff's termination from the company at which he worked for

over twenty years, some eight months prior to the partial vesting of his pension benefits.

Plaintiff alleges he was fired from his job because Defendants wanted to save money, wanted a

_____
[1] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff. <u>See</u> <u>Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.</u>, 998 F.2d 1224, 1230 (3d Cir. 1993).

younger workforce, and wanted to retaliate for Plaintiff's participation in an internal investigation. Defendant contends it was in fact that very internal investigation which revealed the actual, legitimate reason that led to Plaintiff's termination—his failure to report allegations of sexual harassment in the workplace, which he had a duty to report.

Defendant PSEG Nuclear LLC ("PSEG Nuclear") is a subsidiary of Defendant PSEG Power LLC ("PSEG Power"), which in turn is a subsidiary of Public Service Enterprise Group Incorporated ("PSEG Corporation"). (Defs.' SMF ¶ 1.)[2] PSEG Nuclear operates the Hope Creek and Salem Nuclear Generating Stations in Lower Alloways Creek, New Jersey. (Id. ¶ 2.) PSEG Fossil LLC, another subsidiary of PSEG Power, maintained a business services group known as Maplewood Testing Services ("MTS"), which had a workgroup located at PSEG Nuclear's facility. (Id. ¶ 3.) PSEG Nuclear and PSEG Fossil LLC employ both union and non-union employees, the latter commonly being referred to as "MAST" employees. (Id. ¶ 4.) Within PSEG Nuclear, only MAST employees have managerial of supervisory responsibility. (Id.)

Additionally, MAST employees participate in one of two categories of pension plans, depending on their date of hire. (Id. ¶ 13.) Employees hired or made permanent before January 1, 1996 were automatically enrolled in The Pension Plan of Public Service Enterprise Group Incorporated (the "Pension Plan"), whereas MAST employees hired on or after January 1, 1996, participate in The Cash Balance Pension Plan of Public Service Enterprise Group, Inc. (the Cash Balance Plan"). (Id.) Both plans are fully funded by PSEG, include automatic participation for eligible employees upon date of hire, and have the same vesting period. (Id. ¶ 14.)

---

[2] The Court references Defendants' L. Civ. R. 56.1 Statement of Material Facts ("Defs.' SMF") for all facts that are undisputed by the parties. See Hill v. Algor, 85 F. Supp. 2d 391, 408 n.26 (D.N.J. 2000) ("[F]acts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.")

The Pension Plan, as it was in effect in 2010, provides participants with a monthly benefit upon retirement from a PSEG employer, after at least five years of service.  (Id. ¶ 15.)  These retirement benefits are based on the employee's total service and the average of the highest five years of earnings during the last ten years of employment.  (Id.)  Under the Pension Plan, normal retirement age is 65, though participants may be eligible if their age, plus years of credited service equals at least 80 (known as the "Rule of 80").  (Id. ¶ 16.)  Those participants who qualify for and elect early retirement based on the Rule of 80 can begin receiving pension payments upon early retirement, but the pension benefit is reduced by 7% per year for each year the participant is under the age 60.  (Id.)  However, there is no reduction for early retirement under the Rule of 80 if a participant is at least 55 years old with at least 25 years of credited service, or at least 60 years old.  (Id.)  As of 2010, there were approximately 980 active employees of PSEG Nuclear who participated in the Pension Plan.  (Id. ¶ 17.)

The Cash Balance Plan is a pension plan funded by annual contributions from the relevant PSEG employer and interest credits.  (Id. ¶ 18.)  The annual contribution is based on the employee's pay, credited service, and age.  (Id.)  Other than the initial five-year vesting requirement, the Cash Balance Plan does not have the same retirement eligibility milestones as the Pension Plan.  (Id.)  Rather, at retirement, employees can receive their account balance as a lump sum, an annuity, or a combination.  (Id.)

Plaintiff was hired by PSEG Nuclear on April 20, 1987, as a Utility Operator.  (Id. ¶ 5.) During his tenure with PSEG Nuclear he received several promotions, and was finally promoted to the position of Nuclear Maintenance Supervisor in 2005, at the age of 49.  (Id. ¶ 6.)  On September 27, 2010, Plaintiff was terminated from his employment with PSEG Nuclear, at

which time he was 55 years old.  (Id. ¶ 7.)  The Nuclear Maintenance Supervisor position

vacated by Plaintiff was not replaced.  (Id. ¶ 8.)[3]

Plaintiff was a participant in the Pension Plan, and at the time of his termination he was

55 years old and had almost 23.5 years of service.  (Id. ¶ 19.)  Accordingly, Plaintiff was not yet

eligible for retirement or early retirement, but had he remained employed with PSEG Nuclear

through May 2011, he would have been eligible for early retirement under the Rule of 80.  (Id.)

At that time, if he elected early retirement, his pension would have been reduced by 7% for each

year he as younger than 60, which equates to just over 28%.  (Id.)  Had Plaintiff remained

employed with PSEG Nuclear through April 2012, he would have been eligible for early

retirement and an unreduced pension benefit plan, having reached both the age of 55 and 25

years of credited service with his employer.  (Id.)

PSEG has a policy (the "Reporting Policy") addressing sexual and other discriminatory

harassment in the workplace, which at all relevant times not only encouraged all employees to

report any concerns to Employee Relations, but also contained the following heightened

requirement for managerial and supervisory employees: "Managers and Supervisors are required

to report all such incidents known to them to [Employee Relations]."  (Id. ¶ 9 (emphasis

added).)[4]  This obligation of managers and supervisors to report harassment was reinforced in the

_____

[3] Plaintiff admits this fact, but also adds that two of the earlier positions occupied by Plaintiff, prior to his 2005 promotion to Nuclear Maintenance Supervisor, were filled by individuals younger than Plaintiff.  (Plaintiff's Response to Defendants' Statement of Material Facts ("Pl.'s Resp.") ¶ 8 (citing Ex. E to Defs.' Br., PSEG Interrogatory Answers ("PSEG Answers")).)  However, it is unclear why these added facts, that Plaintiff's prior positions were filled by younger employees after he was promoted, are relevant to his ERISA or age discrimination claims.

[4] Plaintiff admits that the Reporting Policy existed, but disputes that it applied to him under the circumstances described more fully infra.  (See Pl.'s Resp. ¶ 9 ("Admitted, but specifically denies the policy applied to Plaintiff in this circumstance because he was not in a supervisory position of C.K., who was the alleged reporter of the sexual harassment investigation.") (citing Ex. A to Pl.'s Opp'n, C.K. Dep. ("Pl.'s Ex. A") 37:5, 12; Ex. D to Pl.'s Opp'n, Relken Dep. ("Pl.'s Ex. D") 66:24, 68:1); see also Pl.'s Resp. ¶ 10 (same); id. ¶¶ 11-12 (disputing that Plaintiff was adequately trained regarding the Reporting Policy) (citing Pl.'s Ex. A 75:5, 12; Pl.'s Ex. D 66:24, 68:1; Ex. B to

PSEG Standards of Integrity ("Standards of Integrity"), which required "[e]mployees who

manage and supervise other employees in the workplace … [t]hrough diligence and reasonable

---

Pl.'s Opp'n, Horneff Dep. ("Pl.'s Ex. B") 72:7-21) (the Court notes that Plaintiff did not attach this page of testimony from Horneff's deposition, but it may be found at Exhibit C to Defendant's Brief ("Defs.' Ex. C").)

First, Plaintiff's citation to C.K.'s deposition testimony in support of this position is unhelpful, as it offers no support for Plaintiff's contention that he was not bound by the Reporting Policy as it applied to co-workers not under his direct supervision, or that he was inadequately trained regarding said policy.  The cited deposition testimony of C.K. only supports the fact that C.K. was not directly supervised by Plaintiff.  (See Pl.'s Ex. A 37:5, 12).

Secondly, while Plaintiff may wish to argue that he was not subject to the quoted policy, the two single lines from the deposition testimony of Relken which he cites not only provide no support for his position, but are taken grossly out of context.  (Compare Ex. B to Defs.' Rep., Relken Dep. ("Relken Dep.") 66:17-67:3 (noting that it is not specifically stated in the PSEG Reporting Policy that "it is a general responsibility of every person in leadership at PSEG to be aware of wrongdoing, and when they become aware of wrongdoing, take actions to protect the employee and the enterprise."); id. 67:23-68:1 (admitting that Plaintiff did not manage or supervise C.K.); with id. 66:2-70:13 (stating, generally, that under any reasonable reading of the PSEG Reporting Policy, all managers and supervisors were required to report known violations with respect to all managed employees, and specifically noting that it applied to Plaintiff and C.K.)  Though there may be ambiguity to the language in the PSEG Policy, Plaintiff's citations do not actually support his alleged dispute—that he was neither subject to the policy because he was not C.K.'s supervisor, nor was he adequately trained with respect to the Reporting Policy.  See also Walters v. Carson, No. 11-6545, 2013 WL 6734257, at * (D.N.J. Dec. 19, 2013) (noting that, where the plaintiff denied the defendants' material fact, but cited to no record evidence and offered only argument in response, legal argument alone "fails to satisfy Plaintiff's obligation under Local Rule 56.1.")

What is more, Plaintiff ignores blatantly contradictory evidence from his own deposition testimony, which he submitted to this Court, clearly supporting the fact that he knew he was required to abide by the Reporting Policy even with respect to a subordinate employee, such as C.K., that did not work directly under him.  (See Pl.'s Ex. B 81:1-5 (admitting that he told PSEG internal investigators he had told C.K. that if she said something to Plaintiff about sexual harassment, he would "have to do something about it."); id. 81:13-82:1 (recalling that Plaintiff told C.K. that she should not tell him anything if she did not want to "get anybody in trouble," because he would have to report anything she told him); 82:19-83:3 (describing his understanding of the "no off-the-record conversations" requirement, which meant that if Plaintiff knew about any violation, including the issue with C.K., as one who was "a supervisor" he was "obligated to tell [PSEG], to report it," and that he had "[this] obligation 24/7, basically."); see also Defs.' Ex. C 75:12-76:8 (stating that, in Plaintiff's understanding of PSEG's sexual harassment Reporting Policy, as a manager or supervisor, "if [Plaintiff] was aware of any type of harassment … then [Plaintiff] was supposed to report it to Human Resources").)

Similarly, the only evidence Plaintiff offers in support of his position that he was inadequately trained with respect to the Standards and Integrity policy does not actually dispute Defendants' stated fact in paragraph 12 of the Statement of Material Facts.  (See Defs.' Ex. C 72:7-12 (stating that Plaintiff took an annual, computer-based test, which probably covered the sexual harassment policy); but see id. 72:14-21 (recalling that the annual computer-based test was based on the Standards of Integrity, but unable to recall if it only covered the sexual harassment policy, or also included other material).)

Based on Plaintiff's misleading and disingenuous arguments, the Court will not credit Plaintiff's position and will consider the facts found in Defendants' Statement of Material Facts from paragraphs 9 thorough 12 undisputed.  See De la Torre v. Lockheed Martin Corp., No. 13-127, 2014 WL 2931268, at *1 n.4 (D.N.J. June 30, 2014) (noting that it was "inappropriate … to deny facts that are plainly supported by the cited portions of the record or advance legal arguments," in a L. Civ. R. 56.1 statement); see also Hill, 85 F. Supp. 2d at 408 n.26.

means … must … report violations or suspected violations of the Standards and the law to the PSEG office of ethics and compliance."  (Id. ¶ 10.)  PSEG employees were required to complete an online training module regarding the Standards of Integrity on a yearly basis, which Plaintiff did.  (Id. ¶ 12.)  Moreover, Plaintiff understood his reporting obligation, and admitted that "if [he] was aware of any time of harassment … then [he] was supposed to report it to Human Resources."  (Id. ¶ 11.)

In April 2010, Roberto Perez, a former member of PSEG's Employee Relations Group, received information from a PSEG Nuclear employee that a female MTS employee, C.K.,[5] had told him she had been the victim of unwanted sexual advances by a male colleague, C.G., while working at PSEG Nuclear's facility.  (Id. ¶ 21.)[6]  The reporting employee further advised Perez that C.K. had accepted a transfer to another facility at which MTS operated in order to avoid having to work with C.G., but that she did not want to leave her position with MTS at PSEG Nuclear's facility.  (Id.)  After referring the allegations to PSEG's Ethics and Compliance Counsel, Hugh Mahoney, Perez and one of his colleagues, Jacqueline Silva, were charged to meet with C.K.  (Id. ¶ 22.)  During the meeting, C.K. confirmed that she was the recipient of unwanted sexual advances of C.G., and told Perez and Silva that she had saved physical evidence

---

[5] Pursuant to Defendants' Motions to Seal (see Doc. Nos. 34, 47), initials will be used through the remainder of this Opinion for all individuals whose names have been redacted.

[6] Plaintiff admits Defendants' facts in paragraphs 21 through 25 "to the extent supported by the Connell Foley investigation," but disputes it "in all other respects," citing generally to Exhibits A and B to the Mark Relken Affidavit (Doc. No. 35-3), submitted with Defendants' Motion for Summary Judgment, which are the Connell Foley Report and Witness Interview Summaries.  (See Pl.'s Resp. ¶¶ 21-25.)  While Defendants provide specific citations to the record in paragraphs 21 through 25 in their Statement of Material Facts, Plaintiff provides no indication what portion of Defendants' facts he disputes, and by citing to nearly 60 pages on the record, the Court is unable to determine which facts are in dispute.  See Raab v. Ocean City, No. 11-6818, 2014 WL 3894061, at *1 n.2 (D.N.J. Aug. 8, 2014) (noting that citation to "almost the entire Complaint" in the movant's Rule 56.1 statement did not "assist the Court" in determining which underlying facts were in dispute and which were not); Baker v. Hartford Life Ins., No. 08-6382, 2010 WL 2179150, at *2 n.1 (D.N.J. May 28, 2010), aff'd 440 F.3d App'x 66 (3d Cir. 2011) (noting that "[i]t is not the Court's responsibility to comb the record on behalf of Plaintiff's counsel").  Accordingly, the Court considers paragraphs 21 through 25 of Defendants' Statement of Material Facts undisputed.

of one encounter with C.G., which they retrieved from her workplace locker.  (Id.)  The evidence

retrieved, a pair of C.K.'s coveralls, ultimately tested positive for spermatozoa.  (Id.)

The law firm of Connell Foley LLP, specifically Tricia B. O'Reilly, was retained to

investigate C.K.'s allegations.  (Id. ¶ 23.)  O'Reilly was assisted by Perez in the investigation,

which will be referred to as the "Connell Foley Investigation."  (Id.)  The specific objective of

the Connell Foley Investigation was to ascertain whether C.K.'s allegations of sexual harassment

against C.G. were credible.  (Id. ¶ 24.)  The investigation included interviews with C.K., C.G.,

and 25 other individuals, site visits, laboratory analysis of physical evidence, and a review of

relevant documents and materials.  (Id. ¶ 25.)  Plaintiff was required to meet with investigators as

part of the Connell Foley Investigation, and was interviewed on June 24, 2010.  (Id. ¶ 26.)  After

the interviews were completed, O'Reilly and Perez drafted a comprehensive summary of each

interview, which resulted in a 109-page document called "Witness Interview Summaries."  (Id. ¶

27.)  The investigation culminated with a memorandum, dated August 12, 2010 ("Connell Foley

Report"), in which O'Reilly concluded that C.K.'s allegations of unwanted sexual conduct were

credible, and detailed a long-term history of harassment by C.G., as reported by C.K., which

peaked in November and December 2009.  (Id. ¶¶ 28-29.)

During the course of the Connell Foley Investigation, two separate but related issues

arose which O'Reilly identified in her report: (1) the lack of compliance by supervisory

personnel with PSEG's Harassment Policy and the Standards of integrity, which required

managers and supervisors to report incidents of sexual or discriminatory harassment, and (2) a

concern regarding the circumstances under which C.K. was transferred from the MTS locations.

(Id. ¶ 30.)  These additional issues were referred to Mark Relken, the Human Resources Director

for PSEG Power, and John Tiberi, the Director of Labor and Employee relations, for further

review.  (Id. ¶ 31.)  A supplemental review ("Supplemental Review") was conducted by Relken

and Tiberi, with the assistance of Frank Romano.  (Id. ¶ 32.)[7]

 As part of their review of the supplemental issues, Relken, Tiberi, and Romano relied

primarily on the extensive information collected during the Connell Foley Investigation.  (Id. ¶

33.)  Specifically, they reviewed the Connell Foley Report and the Witness Interview Summaries

to determine which supervisors reportedly had knowledge of C.K.'s sexual harassment

allegations and which supervisors were involved in effecting C.K.'s transfer to the other MTS

facility.  (Id.)[8]  Relken, Tiberi, and Romano identified 11 supervisors and Human Resource

employees whose conduct warranted closer review.  (Id. ¶ 34.)  Based on the information in their

possession, Relken, Tiberi, and Romano determined whether they had enough information to

make conclusions about the appropriateness of the employees' actions, or whether they needed

additional clarifying information.  (Id.)  Where more additional information was needed for

clarification, additional interviews were conducted.  (Id.)

---

[7] Relken and Tiberi were 60 and 54 years old, respectively, in September 2010 when the Supplemental Review occurred.  (Defs.' SMF ¶ 32.)

[8] Plaintiff admits paragraph 33 to the extend that "[Relken], [Tiberi], and [Romano] may have used the Connell Foley report when conducting Defendant's supplemental investigation," but disputes the paragraph "insofar as this paragraph makes insinuations or conclusions about Defendant's motive in undertaking the supplemental investigation as it relates to Plaintiff."  (Pl.'s Resp. ¶ 33; see also id. ¶ 34 ("Admitted to the extent that Defendant undertook a supplemental investigation of the sexual harassment claims and responses thereto.  Disputed insofar as this paragraph makes insinuations or conclusions about Defendant's motive in undertaking the supplemental investigation as it relates to Plaintiff.").)  However, Plaintiff cites nothing on the record to support his position, and the portions of the record cited by Defendants do support their assertion that the motive for investigating Plaintiff further was to determine which supervisors reportedly had knowledge of C.K.'s sexual harassment allegations.  See Ex. K to Defs.' Br., Relken Dep. ("Defs.' Ex. K") 120:8-122:16, 126:4-7; Relken Aff. ¶ 7 ("To determine which supervisors reportedly had knowledge of [C.K.]'s sexual harassment allegations and which supervisors were involved in effecting [C.K.]'s transfer, Tiberi, Romano and I reviewed the Connell Foley Report and a 109-page document containing summaries of the interviews conducted by O'Reilly and [Perez]").)  Because Plaintiff's position is merely an argument, unsupported by the record, the Court will consider Defendants' facts in paragraphs 33 and 34 undisputed.  See Rodier v. Chico's FAS, Inc., No. 11-4769, 2013 WL 6147781, at *2 n.4 (D.N.J. Nov. 22, 2013) (noting that an argument put forth by counsel, unsupported by evidence on the record, "woefully fail[ed] to satisfy Plaintiff's obligation under Local Rule 56.1") (quoting Assadourian v. Harb, No. 06–896, 2010 WL 2560495, at *4 n. 2 (D.N.J. June 21, 2010)).

As it related to Plaintiff, the Connell Foley Report and Witness Interview summaries revealed the following:

- C.K. identified to O'Reilly and Perez several employees, including Plaintiff, to whom she told that the reason she was relocating to the other MTS facility was because "[C.G.] can't keep his hands off [her]," and/or "[C.G.] can't keep it in his pants." (Id. ¶ 35(a).)[9]

- C.K. reported to O'Reilly and Perez that she told co-workers, including Plaintiff, about the semen-stained coveralls. (Id.)

- Though Plaintiff denied that C.K. provided him with any specific information about C.G.'s conduct, he admitted to O'Reilly and Perez that he heard rumors from others that C.G. inappropriately touched C.K. and that she retained a pair of semen-stained coveralls. (Id. ¶ 35(b).)

---

[9] Plaintiff denies this fact, stating "C.K. did not make any specific allegations involving C.G. or his inability to 'keep his hands off [her]' or 'keep it in his pants' to Plaintiff." (Pl.'s Resp. ¶ 35(a) (citing Pl.'s Ex. B; Ex. A to Melken Aff., Connell Foley Report ("Connell Foley Report"); Ex. B to Melken Aff., Witness Interview Summaries ("Witness Interview Summaries").) As an initial matter, as noted supra at note 6, where Plaintiff cites to the same materials as Defendants, but with no specificity, the Court will not comb the record to find areas of dispute.

In several instances Plaintiff attempts to dispute Defendants' facts concerning what was testified to or reported during the Connell Foley Investigation by stating that Plaintiff was not in fact aware of the sexual harassment allegations or rumors, citing his own deposition testimony. (See Pl.'s Resp. ¶¶ 35(a)-(d).) Here, the Court notes that Defendants' purported fact is not that C.K. in fact conveyed specific allegations of sexual harassment to Horneff, but that she so testified during the Connell Foley Investigation. While the Court recognizes that Plaintiff's deposition testimony supports his position that he was never told by C.K. about any alleged sexual harassment, (see Pl.'s Ex. B 80:17-25), it does not actually dispute Defendants' statement in paragraph 35(a). Because these arguments put forth by Plaintiff are not responsive to Defendants' Statement of Material Facts, as Plaintiff's contentions do not call into question whether certain information was reported during the Connell Foley Investigation, it will consider Defendants' facts in paragraphs 35(a)-(d) undisputed.

Moreover, the Court notes further that Defendants' position is supported by several specific citations to the record, such as where the materials reveal that that C.K. told investigators that Plaintiff was one of the individuals she reported the alleged sexual harassment to. (See Connell Foley Report at PSEG 00290; Witness Interview Summaries at PSEG 00388, 00398, 00405; see also Connell Foley Report at PSEG 00291, 00304; Witness Interview Summaries at PSEG 00383, 00426, 00420-21.)

- Plaintiff also admitted to the investigators that he told C.K. "if she did not want the issues reported, she should not tell Horneff because he would be obligated as a supervisor to make a report." (Id.)

- Another PSEG Nuclear employee disclosed to O'Reilly and Perez that he had spoken with three employees regarding C.K.'s allegations, including Horneff, who responded in a way which led the employee to believe that Horneff knew of the alleged sexual misconduct. (Id. ¶ 35(c).)

- A union employee disclosed to the Connell Foley investigators the circumstances of a conversation regarding C.K.'s allegations of harassment that he had with several employees, including Plaintiff. (Id. ¶ 35(d).)

Based on the consistent accounts by C.K. during the Connell Foley investigation, statements from other employees that Horneff had knowledge of the harassment, and Plaintiff's own statement that he discouraged C.K. from telling him about any harassment, Relken, Tiberi, and Roman concluded that they did not need any clarifying information from Plaintiff. (Id. ¶ 36.)[10]  At the conclusion of the Supplemental Review, the findings and recommendations of Relken, Tiberi, and Romano were summarized in a report dated September 30, 2010. (Id. ¶ 37.) Regarding Plaintiff, it concluded:

> While he denies that [C.K.] herself reported sexual harassment to him, he admits to hearing from others that an incident of unwanted touching had occurred and that [C.K.] had retained the semen-stained coveralls. He did not report these "rumors" – which ultimately were verified as true – to management or HR. Moreover, he admits that he encouraged [C.K.] not to tell him what was going on because of his perception that she did not want the issues reported and his acknowledgment that he would have to report the issues if she told him. This deliberate effort to "avoid" knowledge so as not to have an obligation to report it, is not

---

[10] Plaintiff again disputes Defendants' well supported fact with a legal argument. As noted supra at note 8, the Court will disregard Plaintiff's improper legal argument and consider Defendants' fact undisputed.

consistent with company policy or its expectations for supervisory personnel.  (Id.)[11]

Relken, Tiberi, and Romano recommended that Plaintiff's employment be terminated. (Id. ¶ 38.)  In addition to Plaintiff, on September 27, 2010, four other PSEG supervisors and/or managers were also terminated for failing to comply with the requirements of the Sexual Harassment Policy and the Standards of Integrity and/or their role in transferring C.K. to the other MTS facility.  (Id. ¶ 39.)  Other employees were issued corrective action letters and incurred financial penalties, while several employees received no discipline at all.  (Id.) Following his termination, Plaintiff elected a lump sum payout of his vested pension benefits in the amount of $238,471.26.  (Id. ¶ 42.)

Among the employees discharged alongside Plaintiff, one was a participant in the Cash Balance Pension Plan, one was a participant in the Pension Plan and was entitled to a reduced pension upon his termination, and two were participants in the Pension Plan with fully vested benefits.  (Id. ¶ 40.)  The employees discharged alongside Plaintiff were aged 52, 55, 52, and 57. Among those employees against whom only corrective action was taken, one was aged 53 and the other 54, and both would have fully vested Pension Plan benefits within the next year.  (Id.) Finally, regarding the five employees against whom no action was taken, one was aged 39, the remainder were in their 50s, two were participants in the Cash Balance Plan, one was a Pension Plan participant whose benefits would not vest until 2025, and the other was a Pension Plan participant whose benefits had fully vested.  (Id.)

---

[11] Plaintiff disputes the "veracity of these claims about Plaintiff's actions surrounding the sexual harassment matter," but admits that the conclusion drawn was reported in the manner quoted.  (Pl.'s Resp. ¶ 37.)  Not only has Plaintiff admitted the fact actually asserted by Defendants, he has offered an irrelevant fact, that he was never aware of C.K.'s allegations of sexual harassment, to apparently dispute a fact not asserted by Defendants.  For the same reasons stated supra at note 9, the Court considers Defendants' fact undisputed.

On September 6, 2011, Plaintiff filed his original action in the Superior Court of New

Jersey, Salem County, and that action was removed to this Court on October 23, 2011.  See

Horneff v. PSEG Nuclear, LLC, Civ. No. 11-5980 (D.N.J. filed on Oct. 13, 2011).  On

November 18, 2011, this Court granted Plaintiff's motion for remand, remanding Plaintiff's

claims to state court.  See id.  Back in the superior court, Plaintiff filed a Second Amended

Complaint, which Defendants again removed to this Court, this time on February 15, 2013.  (See

Notice of Removal (Doc. No. 1).)  Plaintiff subsequently moved to amend his Second Amended

Complaint, which the Court granted, and Plaintiff's Third Amended Complaint ("TAC") was

filed in this Court on May 22, 2013 (Doc. No. 7).  The TAC is the operative complaint in this

matter.

In Plaintiff's TAC he alleges the following claims: (1) Count I, a claim for violation of

the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, against all

Defendants; (2) Count II, a claim for age discrimination in violation of the New Jersey Law

Against Discrimination ("NJLAD"), N.J. Stat. § 10:5-12(a), against Defendant PSEG Nuclear;

(3) Count III, a claim for retaliation in violation of the NJLAD, § 10:5-12(d), against Defendant

PSEG Nuclear; (4) Count IV, a claim for wrongful discharge in violation of New Jersey public

policy as provided in Pierce v. Ortho Pharmaceuticals, 84 N.J. 58 (1980), against PSEG Nuclear;

(5) Count V, a claim for age discrimination in violation of the NJLAD, § 10:5-12(a), against

Defendant PSEG Power; (6) Count VI, a claim for retaliation in violation of the NJLAD, § 10:5-

12(d), against Defendant PSEG Power; (7) Count VII, a claim for wrongful discharge in

violation of New Jersey public policy as provided in Pierce, against PSEG Power; (8) Count

VIII, a claim for age discrimination in violation of the NJLAD, § 10:5-12(a), against Defendant

PSEG Corporation; (9) Count IX, a claim for retaliation in violation of the NJLAD, § 10:5-12(d),

against Defendant PSEG Corporation; and (10) Count X, a claim for wrongful discharge in violation of New Jersey public policy as provided in Pierce, against PSEG Corporation.

On June 27, 2014, Defendants filed the present Motion for Summary Judgment (Doc. No. 35). For the reasons set forth below, the Court will grant Defendants' Motion in full.

## II.    LEGAL STANDARD

The Court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. Anderson, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in its favor. Id. at 255; Matsushita, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. Anderson, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which the jury might return a verdict in his favor. Id. at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III.   DISCUSSION

### A.   Plaintiff's ERISA Claim

Section 510 of ERISA makes it unlawful for a person to "discharge, fine, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." 29 U.S.C. § 1140.  The purpose of § 510 is to prevent employers from terminating or harassing employees to prevent them from obtaining ERISA-protected benefits. Kowalski v. L & F Prods., 82 F.3d 1283, 1287 (3d Cir. 1996).

To bring a claim under § 510, Plaintiff must demonstrate: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled."  Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 522 (3d Cir. 1997).  In relevant part, to maintain a claim under § 510, an employee need not prove that the sole reason the employer mistreated the employee was to avoid ERISA-protected benefits, Jakimas v. Hoffmann-LaRoche, Inc., 485 F.3d 770, 785 (3d Cir. 2007) ("[A] plaintiff need not prove that the sole reason for his termination was to interfere with pension rights.") (internal quotation marks omitted), but the employee must show that the defendant-employer had the specific intent to violate ERISA.  Gavalik v. Cont'l Can Co., 812 F.2d 834, 851 (3d Cir. 1987). In other words, a plaintiff must show that "the employer made a conscious decision to interfere with the employee's attainment of [ERISA] benefits."  Jakimas, 485 F.3d at 785 (internal quotations omitted).  "Proof of incidental loss of benefits as a result of a termination will not

constitute a violation of § 510."  Id.  Rather, an employee must put forth "'some additional evidence' suggesting that interference with ERISA benefits was a 'motivating factor' in the employer's decision."  Balmat v. Certain Teed Corp., 338 Fed. App'x 256, 259 (3d Cir. 2009) (quoting Jakimas, 485 F.3d at 785).

A party may prove specific intent through the use of direct evidence or circumstantial evidence.  Gavalik, 812 F.2d at 852 (noting that "[i]n most cases . . . specific intent to discriminate will not be demonstrated by 'smoking gun' evidence" and, as a result, "the evidentiary burden . . . may . . . be satisfied by the introduction of circumstantial evidence.").  When a party has no direct evidence of intent to violate ERISA, courts must use the McDonnell Douglas burden-shifting framework.  Jakimas, 485 F.3d at 785.[12]  Under this familiar standard, once the plaintiff states a prima facie case—which is not an "onerous" burden—then the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the prohibited conduct."  Id. at 786-87.  If the defendant satisfies its burden, the burden then shifts back to the plaintiff to show by a preponderance of the evidence "that the reason articulated by the defendant is merely pretextual."  Id. (internal quotation marks omitted).  In order to meet that burden, the plaintiff must "either directly . . . persuad[e] the court that the discriminatory reason more likely motivated the employer or indirectly [persuade the court] by showing that the employer's proffered explanation is unworthy of credence."  Id. (internal quotation marks omitted).  A "[p]laintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or

---

[12] Where, as here, Plaintiff has not offered any direct evidence of discriminatory intent on behalf of Defendants, but instead relies on circumstantial evidence, the Court utilizes the three-step, burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) when analyzing each of Plaintiff's ERISA and NJLAD claims.  See, e.g., Jakimas, 485 F.3d at 785 (applying McDonnell Douglas framework to § 510 of ERISA); Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97 (1990) (applying McDonnell Douglas framework to NJLAD discrimination claim); Lozo-Weber v. State, No. L-1043-08, 2012 WL 1231920, at *8-9 (App. Div. Apr. 13, 2012) (applying McDonnell Douglas framework to NJLAD retaliation claim) (citing Zive v. Stanley Roberts, Inc., 182 N.J. 426, 447 (2005)).

contradictions in the employer's proffered legitimate reasons for its action to create genuine issues of material fact as to whether the proffered reasons for termination were pretextual." Balmat, 338 Fed. App'x at 259-60 (internal quotation marks omitted).

Plaintiff argues that the timing of his termination was unduly suggestive of discriminatory intent because Defendants terminated his employment eight months before his Pension Plan benefits partially vested, nineteen months before they fully vested, after "twenty-three years of consistently excellent service." (Pl.'s Br. at 13-14.) In addition, Plaintiff argues that PSEG's proffered reasons for terminating his employment were pretextual. Specifically, Plaintiff claims that: (1) Defendants intentionally interpreted its Reporting Policy broadly in order to find a violation justifying Plaintiff's discharge and (2) Defendants treated other employees outside of Plaintiff's protected class differently than him. (Id. at 9.) Defendants responds that summary judgment is appropriate because: (1) temporal proximity, alone, is insufficient to state a prima facie case under § 510, (2) there is no evidence on the record suggesting that the decision-makers who chose to terminate Plaintiff were even aware of the pension plan in which he participated, (3) the other personnel decisions following the Supplemental Review do not support a finding of improper motivation—to terminate employees approaching Pension Plan milestones—on behalf of PSEG, and (4) even if Plaintiff can prove a prima facie case of discrimination, PSEG offered sufficient evidence to support its claim that it terminated Plaintiff because of his failure to abide by his supervisory obligations under the Reporting Policy. (Defs.' Br. at 14-18.)

Because there is no "smoking gun" evidence of specific intent, the Court must examine the record to locate circumstantial evidence of intent. While "[e]conomic benefits enjoyed by defendants when pension benefits are cancelled can be circumstantial evidence of specific intent,

particularly when other circumstances make that cancellation suspicious," Makenta v. Univ. of Pennsylvania, 88 F. App'x 501, 505 (3d Cir. 2004) (citing Einhorn v. AT & T Corp., 248 F.3d 131, 149-50 (3d Cir. 2001)), "vague allegations of malicious termination, unsupported by any facts, are insufficient to support a claim for violation of Section 510." Id. (quoting Romero v. SmithKline Beecham, 309 F.3d 113, 119 (3d Cir. 2002)).  Furthermore, a plaintiff's "mere subjective belief as to the defendant's motives [is] insufficient" to support a § 510 claim. Harrigan v. Key Bank, No. 05-3302, 2008 WL 2354976, at *9 (D.N.J. June 4, 2008) (citing Makenta, 88 F. App'x at 505).  Additionally, "where the only evidence that an employer specifically intended to violate [Section 510] is the employee's lost opportunity to accrue additional benefits, the employee has not put forth evidence sufficient to separate that intent from the myriad of other possible reasons for which an employer might have discharged [the employee]." Makenta, 88 F. App'x at 505.  Though an employee may rely on the timing of an adverse employment action if the timing is unusually suggestive, Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000), temporal proximity alone is insufficient circumstantial evidence to maintain a question of fact on the issue of specific intent.  Larrison v. Lucent Technologies, Inc.,   (D.N.J. Aug. 20, 2004) (citing Dewitt, 106 F.3d at 523 n.9 (noting that termination two weeks prior to date on which the plaintiff's benefits would have been made available was, standing alone, "insufficient to support a section 510 claim")).

Here, the circumstantial evidence is far too vague to support a finding that PSEG terminated Plaintiff's employment in order to interfere with Plaintiff's ERISA-protected benefits. The only evidence cited by Plaintiff in support of his position demonstrates that he was terminated eight months before his Pension Plan benefits would have partially vested, and some

nineteen months before they would have fully vested.[13]  This temporal proximity is not itself

unusually suggestive, and Plaintiff has failed to provide any other evidence tending to show

Defendants' specific intent.  See Pailleret v. Jersey Constr., Inc., No. 09-1325, 2011 WL

1485402, at *6 (D.N.J. Apr. 19, 2011) (noting that a six month period alone is not unusually

suggestive in Third Circuit adverse employment cases, whereas an adverse employment action

"occur[ring] a few days after the protected activity," would be "unusually suggestive of an

impermissible motive") (internal quotation marks omitted) (citing Farrell, 206 F.3d at 280; Rook

v. Alloy Surfaces Co., Inc., No. 09-839, 2010 WL 2697304, at *2 (E.D. Pa. July 6, 2010) (citing

Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989))).

Further, there is no evidence of how much money Defendants stood to save by

terminating Plaintiff before his benefits either partially or fully vested.[14]  Plaintiff has not shown

that those who made the decision to terminate his employment knew that he was on the Pension

Plan.  In fact, Plaintiff does not adequately address Defendants' evidence that only one of the

other ten PSEG supervisors, whose conduct was reviewed in the Supplemental Review, was both

terminated and was a Pension Plan participant with unvested benefits.  The three other

terminated employees either had fully vested benefits in the Pension Plan or were participating in

the Cash Balance Plan.  (Defs.' SMF ¶ 40.)  Of the six employees not discharged, three were

participants in the Pension Plan with unvested benefits, one was a Pension Plan participant with

fully vested benefits, and two were Cash Balance Plans participants.  (Id.)  Without any apparent

---

[13] While Plaintiff alleges he had "twenty-three years of consistently excellent service" with Defendants, he has cited no evidence in the record to support this contention.

[14] An argument concerning financial savings, alone, would also be unpersuasive because the mere fact that an employer has an incentive to terminate an employee does not mean that the employer actually terminated that employee for the specific purpose of interfering with ERISA-protected rights.  See Makenta, 88 Fed. App'x at 505; Harrigan, 2008 WL 2354976, at *10 (acknowledging that defendants "may have had an incentive to interfere with plaintiff's eligibility [for ERISA-protected benefits]" but finding that a mere incentive alone, without more, is insufficient to support a § 510 claim).

pattern, the terminations are hardly suggestive of illicit intent to terminate Plaintiff based on approaching Pension Plan milestone. Because Plaintiff points to no evidence on the record supporting a finding of specific intent to prevent him from obtaining a pension benefit, the Court finds that he has failed to state a prima facie case under § 510. Harrigan, 2008 WL 2354976, at *10 (citing Makenta, 88 Fed. App'x at 505); Grogan v. Duane, Morris & Heckscher, No. 90-4105, 1991 WL 98888, at *4 (E.D. Pa. 1991).

Even if the Plaintiff had stated a prima facie case, he entirely fails to overcome Defendants' asserted legitimate, non-discriminatory reason for Plaintiff's termination. The undisputed facts show that the individuals who made the recommendation to terminate Plaintiff's employment did so on the basis of their review of the Connell Foley Report and the Witness Interview Summaries. (See Defs.' SMF ¶¶ 34-38.) Those materials indicated that, at the least, the victim in the sexual harassment investigation and two other employees had told the investigators that Plaintiff was aware of C.K.'s allegations of harassment against C.G. (Id. ¶ 35.) Moreover, Plaintiff admitted to investigators that he knew he was under a duty to report any instances of harassment that were revealed to him, and that he had told C.K. she should not tell him anything that she did not want reported. (Id. ¶ 35(b)) Plaintiff even admitted to investigators that he had heard rumors of sexual harassment in the work place between unknown individuals, but chose not to report such "rumors." (Id.) Based on the record of Plaintiff's conduct and the Reporting Policy applicable to PSEG supervisors and managers, Relken, Tiberi, and Romano concluded that Plaintiff had failed to fulfill his obligations under the policy, and recommended his termination. (Id. ¶ 36-38.) On these facts, the Court finds that Defendants have demonstrated a legitimate, non-discriminatory reason for terminating Plaintiff's employment. See Ade v. KidsPeace Corp., 401 Fed. App'x 697 (3d Cir. 2010) (finding that

plaintiff's violation of defendant's harassment policy was a legitimate reason for his

termination); Byrd v. Lynch, No. 10-247, 2011 WL 2680572, at *6 (D.N.J. July 8, 2011) (same).

In order to maintain his claim, it is Plaintiff's obligation to show that this proffered reason is

actually pretextual.  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (stating that to overcome

defendant's proffered non-discriminatory reason, "plaintiff must point to some evidence, direct

or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more

likely than not a motivating or determinative cause of the employer's action.") (citing St. Mary's

Honor Center v. Hick, 509 U.S. 502, 510 (1993)).

Plaintiff contests the veracity of Defendants' asserted facts, but offers no credible

evidence to the contrary.  The Court takes Plaintiff's point that it is disputed as to whether

Plaintiff in fact was aware of the sexual harassment allegations from C.K., (see Pl.'s Resp. ¶ 35

(citing Pl.'s Ex. B)), but Plaintiff really misses the forest for this lone tree.  Defendants'

proffered reason for terminating Plaintiff's employment was that the material contained in the

report indicated Plaintiff had violated the Reporting Policy.  That material may have been

inaccurate, though Plaintiff offers no evidence to suggest that the testimony of those quoted and

identified in the Connell Foley Report and the Witness Interview Summaries was incredible, but

Defendants apparently relied on that material in good faith, and Plaintiff again offers no evidence

to dispute this.  Ditzel v. Univ. of Med. & Dentistry of N.J., 962 F. Supp. 595, 604 (D.N.J. 1997)

("To discredit an employer's proffered reason of poor performance, plaintiff cannot simply show

that the employer's decision was 'wrong or mistaken' but instead must show that it was

motivated by discriminatory animus.  Courts are not permitted to second-guess performance

standards or 'to make personnel decisions for employers.'") (internal quotation marks and

citation omitted) (quoting Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 87 (1978) and

citing Fuentes, 32 F.3d at 765).[15]  Moreover, Plaintiff does not dispute that he told C.K., prior to

her transfer, she should not tell him about any issues in the workplace that she did not want

reported, because he would be under an obligation to report them, or that after her transfer he

heard explicit rumors about sexual harassment in the workplace and decided against reporting

them.  While Plaintiff maintains he was unaware of the sexual harassment allegations, he fails to

properly address Defendants' claim that it properly relied on the contents of the Connell Foley

Report and Witness Interview Summaries.

Finally, as discussed above, Plaintiff has offered little, if any evidence that Defendants

treated him differently than employees outside his protected class.  The record shows that three

of the five individuals terminated as a result of the Supplemental Review either already had

vested benefits in the Pension Plan or were participants in the Cash Balance Plan, and of the six

employees not terminated, three had unvested benefits in the Pension plan, two of which had

benefits that were going to vest in the following year, one had fully vested benefits in the

Pension Plan, and two were participants in the Cash Balance Plan.  (See Defs.' SMF ¶ 40.)[16]  In

sum, Plaintiff points to no disputed facts or evidence on the record which suggests Defendants'

proffered legitimate, non-discriminatory reason for Plaintiff's termination was pretextual.

Because Plaintiff both fails to support a prima facie case by offering evidence upon

which a reasonable jury could conclude that PSEG terminated his employment for the specific

---

[15] Plaintiff attempts to argue that Defendants' interpreted the Reporting Policy in an overly broad manner as a pretext for firing him.  As noted above, supra at note 4, Plaintiff's own testimony belies his argument, and Plaintiff has not pointed to any evidence on the record which actually disputes the reasonableness of Defendants' interpretation and application of the Reporting Policy.

[16] The Court also notes that, of the eleven individuals reviewed in the Supplemental Review, ten were over the age of 50.  (Defs.' SMF ¶ 40.)  Of those ten, five were discharged and five were not.  (Id.)  The remaining employee was only 39 years of age, and was not discharged.

purpose of interfering with his ERISA-protected rights, and fails to offer evidence that Defendants' non-discriminatory reason for terminating his employment was pretextual, the Court will grant Defendants' Motion for Summary Judgment on Count I, Plaintiff's § 510 claim.

**B.      Plaintiff's NJLAD Age Discrimination Claims**

To establish a prima facie case of age discrimination under the NJLAD, Plaintiff must show: (1) he belongs to a protected class; (2) he performed his job at a level that satisfied PSEG's legitimate expectations; (4) he was discharged; and (4) he was replaced by someone sufficiently younger to permit an inference of age discrimination, or other evidence giving rise to an inference of age discrimination. Young v. Hobart West Group, 385 N.J. Super. 448, 458-59 (App. Div. 2005) (citing Bergen Commercial Bank v. Sisler, 157 N.J. 188, 210-13 (1999); Maxfield v. Sinclair Int'l., 766 F.2d 788, 792 (3d Cir. 1985)).

Defendants argue that Plaintiff has failed to establish a prima facie case because he points to no evidence suggesting that age played a part in PSEG's decision to terminate Plaintiff's employment. (Defs.' Br. at 21-23.) Defendants also note that two individuals who investigated Plaintiff's conduct as part of the Supplemental Review and subsequently recommended Plaintiff's termination were part of Plaintiff's same protected class, i.e., they were both over the age of 50. (Id. at 22; see also Defs.' SMF ¶ 32.) Plaintiff responds by saying that because he and the other four individuals who were terminated as a result of the Supplemental Review were over the age of 50, he has met his burden of establishing a prima facie case. (Pl.'s Opp'n at 17-18.)

The Court finds that Plaintiff has failed to state a prima facie case, as he has not pointed to evidence tending to show that PSEG acted with a discriminatory purpose when it terminated Plaintiff's employment. As noted above, the conduct of eleven PSEG supervisors or managers

was reviewed as a result of the supplemental review, and only one of them was under the age of 50.[17]  Of the other ten employees reviewed, five retained their jobs and five were terminated. The Court can hardly consider this suggestive of an impermissible, age-based discriminatory motive on behalf of Defendants.  Plaintiff, however, offers no other evidence in support of his claims.  Moreover, the Court considers it significant, though not dispositive, that Melken and Tiberi, the decision makers with respect to Plaintiff's termination, were both in Plaintiff's protected class.  See Young, 385 N.J. Super. at 461-62 (citing Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991)).  Finally, it is undisputed that Plaintiff's vacated position was not replaced by any employee, let alone a younger employee.  (Defs.' SMF ¶ 8; see also Bergen, 157 N.J. at 213 ("[U]nder the [NJLAD] … courts have modified the fourth element to require a showing that the plaintiff was replaced with 'a candidate sufficiently younger to permit an inference of age discrimination.'") (citing Kelly v. Bally's Grand, Inc., 285 N.J. Super. 422, 429 (App. Div. 1995)).)  Based on this record, the Court finds no evidence in support of Plaintiff's claim.

Further, even if Plaintiff had shown a prima facie claim, as discussed at some length above in Part III.A, Plaintiff has produced no evidence suggesting that Defendants' proffered legitimate, non-discriminatory reason for Plaintiff's termination is pretextual.  For these reasons, the Court will grant Defendants' Motion for Summary Judgment as to Counts II, V, and VIII, Plaintiff's NJLAD age discrimination claims.

### C.    Plaintiff's NJLAD Retaliation Claims

To establish a prima face retaliation claim under the NJLAD, Plaintiff must show "(1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse

---

[17] See supra note 16.

employment action." Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (citing Santi v. CAN Ins. Cos., 88 F.3d 192, 198 (3d Cir. 1996)).

Defendants argue that Plaintiff cannot establish a prima facie case because he has not shown that he was engaged in a protected activity, and even if he were, he cannot show a causal connection between the interview and his discharge. (Defs.' Br. at 24.) Further, Defendants argue that even if Plaintiff established a prima facie case, he has failed to show pretext in the face of Defendants' proffered non-discriminatory reason for Plaintiff's termination. (Id. at 28.)

The Court will discuss only a few of the menagerie of concerns it has with Plaintiff's NJLAD retaliation claim. Setting aside Defendants' argument that Plaintiff did not engage in protected activity by participating in an interview as part of an internal investigation, (see Defs.' Br. at 28 n.15),[18] the Court notes that Plaintiff has shown no causal connection between his participation in the Connell Foley Investigation and his termination. Plaintiff seems only to rely on temporal proximity. Yet, the Third Circuit has made clear that temporal proximity alone, unless "unduly suggestive," such as a matter of days, is "insufficient to establish the necessary causal connection." Cardenas, 269 F.3d at 264 (quoting Farrell, 206 F.3d at 280). Here, Plaintiff acknowledges that he was interviewed as part of the Connell Foley investigation in June 2010, but he was not terminated until the end of September 2010. (Pl.'s Opp'n at 19-20.) Additionally, eleven other PSEG managers and supervisors were interviewed as part of the Connell Foley Investigation and were later the subject of the Supplemental Review, yet only five

---

[18] While the Court considers Defendants' citation to Title VII decisions, which have held that participating in internal investigations is not protected activity, persuasive on this point, see, e.g., Slagle v. Cnty. Of Clarion, 435 F.3d 262, 265 (3d Cir. 2006); Matthews v. Cingular Wireless, No. 08-5650, 2011 WL 601372, at *5 (D.N.J. Feb. 16, 2011); Tuthill v. Consolidated Rail Corp., No. 96-6868, 1997 WL 560603, at *4 (E.D. Pa. Aug. 26, 1997), particularly in light of the application of Title VII principles when analyzing the NJLAD, see Bergen, 157 N.J. at 207 (quoting Grigoletti, 188 N.J. at 96-97), the Court need not reach this issue because it finds Plaintiff has failed to establish another required element of his prima facie case, and has failed to show pretext as part of the third-prong of the McDonnell Douglas framework.

24

of them were terminated.  Based on the record, the Court finds no evidence suggesting a causal connection.

Contrary to Plaintiff's assertion, it is not farcical for Defendants to argue that Plaintiff was not terminated because he participated in the investigation, but instead because of what that investigation revealed about his conduct.  (See Pl.s' Opp'n at 19.)  If, as Defendants assert, the investigation exposed that Plaintiff violated his obligations under the Reporting Policy, then PSEG would be left in a position in which it could take no action against Plaintiff under his theory.  This would be unreasonable, as it would discourage employers from investigating allegations in the work place for fear of being placed in a catch-22 if it was revealed that those being interviewed were in the wrong.  What appears farcical to the Court is Plaintiff's attempt to argue in one breath that he told investigators he knew nothing of C.K.'s alleged sexual harassment allegations, and then cast his participation in the sexual harassment investigation as protected activity and evidence of his opposition to sexual harassment in the other breath.  Such a position is particularly illogical in light of the fact that it was Defendants who voluntarily undertook what was likely a costly and clearly time consuming investigation to ascertain the credibility of C.K.'s allegations of sexual harassment, ultimately finding her allegations to be credible.  That Defendants would at once instigate such a costly endeavor with the intent of finding the truth of the allegations, while simultaneously retaliating against an employee who provided minimal useful information, strains belief.  Coupled with the sheer lack of evidence concerning his allegations, it should be hardly surprising that the Court finds no support, in logic or the record, for Plaintiff's NJLAD retaliation claim.

Finally, even if Plaintiff had shown a prima facie claim, as discussed at some length above in Part III.A, Plaintiff has produced no evidence suggesting that Defendants' proffered

legitimate, non-retaliatory reason for Plaintiff's termination is pretextual.  For these reasons, the Court will grant Defendants' Motion for Summary Judgment as to Counts III, VI, and IX, Plaintiff's NJLAD retaliation claims.

**D.     Plaintiff's <u>Pierce</u> Claims**

To establish a <u>Pierce</u> claim for common law wrongful discharge, the employee must identify the clear mandate of public policy and that the discharge itself was in violation of that public policy.  <u>Tartaglia v. UBS PaineWebber Inc.</u>, 197 N.J. 81, 109 (2008); <u>MacDougall v. Weichert</u>, 144 N.J. 380, 391 (1996).  Generally, "the employee must show retaliation that directly relates to an employee's resistance to or disclosure of an employer's illicit conduct."  <u>Id.</u> at 393.  However, Plaintiff may also show that Defendants' retaliation was based on his exercise of certain established rights, thereby violating a clear mandate of public policy.  <u>Id.</u>

Defendants argue that Plaintiff cannot bring a common law <u>Pierce</u> claim if the specific expression of public policy he relies on is coterminous with his NJLAD claim, but even if Plaintiff can bring such a claim, he fails to maintain the substantive elements of a <u>Pierce</u> claim.  (Defs.' Br. at 29-33.)  Plaintiff did not oppose Defendants' Motion for Summary Judgment as to his <u>Pierce</u> claims.

With respect the first requirement, the employee must identify the clear mandate of public policy.  <u>Mehlman v. Mobil Oil Corp.</u>, 153 N.J. 163, 180 (N.J. 1998); <u>but see</u> <u>MacDougall</u>, 391-92 ("A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate.  Its alleged violation will not sustain a wrongful discharge cause of action.")  Public policy sources can include "legislation[,] administrative rules, regulations or decisions[,] . . . judicial decisions[, and] [i]n certain instances, a professional code of ethics."

Pierce, 84 N.J. at 72.  Absent legislation, the courts are to define the cause of action in "case-by-case determinations."  Id.

Here, Plaintiff has not alleged that he resisted or attempted to disclose Defendants' illicit conduct.  Instead, Plaintiff appears to allege that Defendants violated their own Employee Standards for Business Conduct and Integrity Standards by terminating Plaintiff's employment after he participated in the Connell Foley Investigation.  (See TAC ¶¶ 62-64.)  The only public policy identified by Plaintiff is "New Jersey's clear mandate of public policy to protect employees who participate in workplace investigations as evidenced by … laws such as the [NJLAD] and the Conscientious Employee Protection Act."  (Id. ¶ 65.)  In all respects, Plaintiff's common law claim is based on the identical facts and conduct as his NJLAD retaliation claim, and he seeks the same remedies.  (Compare id. ¶¶ 53-60; with id. ¶¶ 62-69.)

The Third Circuit has held that where the sources of public policy relied on by a plaintiff are coterminous with his statutory claims, he cannot bring a separate Pierce public policy claim. Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 73 (3d Cir. 1996) (citing Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476 (App. Div. 1994) (ruling common law claim of violation of public policy should not be submitted to jury where statutory remedy under LAD exists), certif. denied, 136 N.J. 298 (1994); Shaner v. Horizon Bancorp., 116 N.J. 433, 454 (1989) ("Because the LAD provides ... a remedy, it might be unnecessary to recognize or create a Pierce-type action to vindicate substantially the same rights and provide similar relief")). Because Plaintiff's Pierce claim is premised on the public policy embodied in the NJLAD retaliation provision, it fails as a matter of law.  See Bell v. KA Indus. Services, LLC, 567 F. Supp. 2d 701, 709 (D.N.J. 2008).[19]

---

[19] While Plaintiff also references the Conscientious Employee Protection Act ("CEPA"), see N.J. Stat §§ 34:19-1 et seq., he fails to allege any facts that would implicate CEPA's prohibitions.  In relevant part, CEPA provides a cause

Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to

Counts IV, VII, and X, Plaintiff's <u>Pierce</u> claims.

## IV.   CONCLUSION

For the reasons expressed above, Defendants' Motion for Summary Judgment will be

**GRANTED**.  An appropriate Order shall enter.


Dated:  1/21/2015                            s/ Robert B. Kugler
                                             ROBERT B. KUGLER
                                             United States District Judge

---

of action for situations where employers take retaliatory action against employees for: (a) disclosing to a supervisor or public body an activity, policy, or practice of the employer that the employee reasonably believes is in violation of law; (2) providing information to, or testifying before, any public body conducting an investigation into a violation of law by the employer; or (3) objecting or refusing to participate in any activity, policy, or practice which the employee reasonable believes is in violation of a law, fraudulent or criminal, or is incompatible with a clear mandate of public policy.  <u>See</u> § 34:19-3.  Plaintiff's Complaint nowhere suggests that he disclosed, testified concerning, or objected to any activity, policy or practice of Defendants which was illegal or violated a clear mandate of public policy.  His only contention is that he participated in an internal sexual harassment investigation, during which he provided little relevant information based on his alleged lack of knowledge.  The Court finds that Plaintiff has not alleged any circumstances giving rise to a <u>Pierce</u> claim based on the policies underlying CEPA.